**HERITAGE OPERATING, L.P., Appellant**

v.

**BARBERS HILL INDEPENDENT SCHOOL DISTRICT; Chambers County; and the City of Mont Belvieu, Appellees**

NO. 14–14–00187–CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion on Rehearing filed June 16, 2016

Robert J. Myers, John Shaw, Forth Worth, TX, for Appellant.

Michael J. Darlow, Yolanda Michelle Humphrey, Joe Longoria, Houston, TX, for Appellee.

Panel consists of Justices Christopher, Donovan, and Wise.

## OPINION ON REHEARING

Tracy Christopher, Justice

We grant appellant's motion for rehearing, withdraw our memorandum opinion issued July 2, 2015, and issue this opinion on rehearing.

In this suit to collect delinquent taxes for the 2004 tax year, the property owner both defended and counterclaimed on the ground that its personal property, which initially was omitted from the 2004 appraisal roll, was not added to the appraisal records within two years, and thus, the assessment is void. The taxing authorities responded that the property owner's failure to exhaust its administrative remedies under the Property Tax Code deprived the trial court of jurisdiction over the property owner's defense and counterclaim. The property owner challenges the trial court's ruling granting the taxing authorities' summary-judgment motion and implicitly denying the property owner's competing motion. Our disposition of the appeal turns on the answer to two questions.

First, did the property owner's failure to challenge the appraisal before the appraisal review board deprive the trial court of jurisdiction to consider the property owner's defense? We conclude that no competent summary-judgment evidence controverts the property owner's evidence that the chief appraiser failed to deliver a notice of appraised value. The property owner had no written notice of the appraisal or taxes until it received a demand for payment of delinquent taxes, by which time it was too late to file a protest. Because the Property Tax Code provided no administrative remedies for the property owner to exhaust, the property owner's failure to file a protest did not deprive the

trial court of jurisdiction to hear the property owner's defense to the tax-collection suit.

Second, did the appraisal district add the property to the appraisal records for the 2004 tax year within two years as statutorily required? We conclude that the property owner rebutted the presumption that all persons involved complied with their respective statutory duties in appraising the property and assessing taxes. Because the taxing authorities failed to conclusively establish that all statutory duties were discharged and that the delinquent-tax rolls are correct, the trial court erred in granting their summary-judgment motion. The taxing authorities nevertheless produced evidence sufficient to raise a question of fact about whether the property was timely added to the appraisal records, and thus, the trial court did not err in denying the property owner's motion for summary judgment.

We accordingly reverse the judgment and remand the cause to the trial court.

## I. BACKGROUND

In tax year 2004, property owner Heritage Operating, L.P. ("Heritage") stored petroleum products in an underground storage facility within the jurisdiction of the City of Mont Belvieu, the Barbers Hill Independent School District, Chambers County (collectively, "the Taxing Units"), and the Chambers County Appraisal District ("the District"). In a later year, the District appraised the property's 2004 taxable value at more than $8.34 million.[1] Heritage did not pay the taxes assessed, and the Taxing Units sued to collect taxes,

penalties, interest, costs, and attorney's fees.

In its summary-judgment motion, Heritage argued that (a) its property was not added to the appraisal records within two years of the 2004 tax year; (b) it was first informed of the property's appraised value when a delinquent-tax notice was delivered in May 2007; and (c) under the version of the Property Tax Code ("the Code") in effect at the time, Heritage could not file a tax protest once the taxes became delinquent, so that the lack of notice violated Heritage's right to due process.

The Taxing Units filed a combined summary-judgment response and plea to the jurisdiction in which they argued that the trial court lacked jurisdiction to consider Heritage's defense because Heritage failed to exhaust its administrative remedies. As they alternatively phrased the argument, the trial court could not consider the merits of Heritage's position because the procedures set forth in the Code are the exclusive means to adjudicate any authorized ground of protesting the appraisal or the tax assessment.[2] According to the Taxing Units, a later version of the Code applies. Under that version, a property owner still must file a protest and pay at least the undisputed portion of the taxes before they become delinquent. This later version, however, permits the delinquency date to be retroactively postponed based on lack of notice. The Taxing Units also filed their own motion for summary judgment based solely on the statutory presumption that their delinquent-tax rolls are correct.

The trial court overruled all of the parties' objections to the opposing side's evi-

---

1. Heritage represents that it rendered the property in 2005, while the Taxing Units assert that Heritage rendered the property in 2006. Neither side presented any evidence on the subject.

2. *See* TEX. TAX CODE ANN. § 42.09 (West 2015).

dence; granted summary judgment in favor of the Taxing Units for $588,054.71 in back taxes, penalties, interest, attorney's fees, and research costs; and ordered Heritage's property sold to satisfy the judgment.

In a single issue, Heritage argues that the trial court erred in granting the Taxing Units' summary-judgment motion and denying Heritage's motion.

## II. WAIVER

■ Before considering the merits of Heritage's appeal we must address a threshold issue raised by the Taxing Units. In the trial court, the Taxing Units filed a combined plea to the jurisdiction and response to Heritage's summary-judgment motion, and on appeal, they argue that we should summarily affirm the trial court's judgment because Heritage "failed to separately appeal the trial court's order granting the various pleas [to the jurisdiction]." This argument fails for several reasons.

■ First, the clerk's record contains no ruling on the jurisdictional plea. The Taxing Units concede as much, but they assert that "[t]he pleas were heard and impliedly granted by the court at the summary judgment hearing."[3]

In support of their position that the trial court ruled on the plea to the jurisdiction, the Taxing Units cite only the trial court's final judgment. After stating that it heard the cross-motions for summary judgment,

the trial court made its ruling in a single sentence: "After *considering* the pleadings, motions, responses, jurisdictional pleas, evidence on file, and arguments of counsel, the court *granted* Plaintiffs' motion in all respects and *denied* Defendant's motions [sic] in all respects." (emphasis added). By this language, the trial court did not imply a discrete ruling granting the plea to the jurisdiction. It instead shows that when the trial court ruled on a matter, it said so. "Considering" the plea to the jurisdiction does not imply "granting" it, because the trial court also "considered" pleadings and Heritage's summary-judgment motion. The former required no ruling, and the latter was denied. Even granting the Taxing Units' summary-judgment motion "in all respects" does not suggest a separate ruling on the plea to the jurisdiction, because the plea was not part of their motion. It instead was part of their response to Heritage's motion for summary judgment. We conclude that the trial court did not grant the plea to the jurisdiction.

The trial court did rule on the summary-judgment motions, however, and Heritage addresses the jurisdictional arguments as part of its appeal of those rulings. Far from waiving the issue of jurisdiction, Heritage has devoted the majority of its brief to the subject. Heritage was not required to challenge the jurisdictional arguments in a separate issue.

---

3. A trial court can implicitly rule on a jurisdictional challenge. *See Thomas v. Long*, 207 S.W.3d 334, 339–40 (Tex.2006) (holding that "a trial court that rules on the merits of an issue without explicitly rejecting an asserted jurisdictional attack has implicitly denied the jurisdictional challenge"). Such an implied ruling arises when, by ruling on the merits, "the trial court necessarily denie[s] [the] challenge to the court's jurisdiction." *Id.* at 340. That rationale does not apply (nor do the

Taxing Units contend otherwise), because here, the Taxing Units challenged the trial court's jurisdiction over Heritage's defense; thus, the trial court could reach the merits of the Taxing Units' claim regardless of whether it had jurisdiction to consider Heritage's defense. We cannot conclude that the trial court determined that it lacked jurisdiction to consider those matters, rather than simply finding Heritage's arguments unmeritorious.

## III. STANDARD OF REVIEW

When faced with competing summary-judgment motions, we consider the evidence presented by each party, determine de novo all questions presented, and render the judgment the trial court should have rendered. *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex.2015). We view the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006). If the movant establishes each element of the claim or defense for which it seeks traditional summary judgment, then the burden shifts to the nonmovant to disprove or raise a genuine issue of material fact regarding at least one of those elements. *Katy Venture, Ltd. v. Cremona Bistro Corp.*, 469 S.W.3d 160, 163 (Tex.2015) (per curiam).

## IV. THE TRIAL COURT'S JURISDICTION OVER HERITAGE'S DEFENSE

■ The Code details the administrative procedures for contesting property appraisals and tax assessments. *See Cameron Appraisal Dist. v. Rourk*, 194 S.W.3d 501, 502 (Tex.2006) (per curiam). Any ground of protest that the Code authorizes can be adjudicated only by the procedures it prescribes. *See* Tex. Tax Code Ann. § 42.09 (West 2015). These administrative-review procedures are intended to resolve the majority of tax protests, relieving the burden on the courts to do so. *Webb Cty. Appraisal Dist. v. New Laredo Hotel, Inc.*, 792 S.W.2d 952, 954 (Tex.1990). Consequently, and with few exceptions, a property owner that can raise a defense administratively must do so, or it will be barred from raising that ground in a tax suit, either as defense to the taxes' collection or as an affirmative claim for relief. *See* TEX. TAX CODE ANN. § 42.09. If the property owner fails to seek available relief before the administrative review board, the courts lack jurisdiction to decide most matters relating to the property owner's ad valorem taxes. *See Matagorda Cty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 331 (Tex.2005).

According to the Taxing Units, the trial court lacked jurisdiction over Heritage's defense and its claim to have the tax assessment declared void because Heritage did not exhaust its administrative remedies by following the Code's procedures. The parties disagree about what procedures were required and what remedies were available, but three key facts are undisputed: (1) the District initially omitted the property from the 2004 appraisal records; (2) in May 2007, Heritage received written notice that the 2004 taxes were delinquent; and (3) Heritage did not file a tax protest before the appraisal review board.

We therefore begin our analysis by summarizing the administrative procedures that, at the relevant time, governed the appraisal of personal property that initially was omitted from the appraisal records.

### A. Administrative Procedures Generally Applicable to Previously Omitted Personal Property

To identify the administrative procedures that apply to this case, we must know which version of the relevant provisions of the Code apply. The Taxing Units maintain that the property at issue was added to the appraisal records in December 2006, and that a notice of the property's appraised value was delivered to Heritage around the same time. Heritage contends that the property was added to the appraisal records in May 2007, and that it had no written notice of a property appraisal or tax assessment for 2004 until it received a letter concerning delinquent taxes in May 2007. Because the parties disagree about whether Heritage's first

written notice of the appraisal or taxes was delivered in December 2006 or May 2007, we will begin by outlining the pertinent procedures in effect during that six-month period.

At that time, the steps governing the appraisal of omitted personal property were as follows:

1. The chief appraiser adds omitted personal property to supplemental appraisal records within two years of the omitted year.[4]

2. The chief appraiser then sends notice to the property owner of the appraised value, and if applicable, submits the supplemental appraisal records to the appraisal review board for review and determination of protests.[5]

3. A property owner wishing to challenge the appraisal must file a notice of protest within thirty days after the chief appraiser delivers the notice of appraised value.[6]

4. The appraisal review board determines any protests, makes any changes to the appraisal records, and approves the supplemental records.[7]

5. The chief appraiser adds the supplemental appraisal records as changed and approved by the board to the district's appraisal roll and certifies the addition to the taxing units.[8] The appraisal roll cannot be changed except as provided by section 25.25 or by chapters 41 or 42 of the Code.[9]

6. A taxing unit's assessor (or in the case of a county, the county assessor-collector) calculates the taxes imposed on each property included in the taxing unit's appraisal roll.[10]

As these steps show, the property owner generally has a thirty-day window to file a notice of protest, and the time is measured from the delivery of a notice of the previously omitted property's appraised value. But what if, as Heritage contends, the required notice of the appraised value was not delivered to, or received by, the property owner?

---

4. *See* TEX. TAX CODE ANN. § 25.21(a) (West 2015) ("If the chief appraiser discovers ... that personal property was omitted from an appraisal roll in one of the two preceding years, he shall appraise the property as of January 1 of each year that it was omitted and enter the property and its appraised value in the appraisal records.").

5. *See id.* § 25.23(c) (West 2015 & Supp.2015) ("As soon as practicable after determining the appraised value of a property listed in supplemental appraisal records, the chief appraiser shall deliver the notice required by Section 25.19, if applicable, and submit the records for review and determination of protest as provided by Section 25.22"); Act of May 30, 1999, 76th Leg., R.S., ch. 1517, § 1, 1999 TEX. GEN. LAWS 5239, 5239–41 (amended 2003, 2005, 2007 and 2015) (current version at TEX. TAX CODE ANN. § 25.19 (captioned "Notice of Appraised Value")); TEX. TAX CODE ANN. § 25.22 (West 2015) (stating that the chief appraiser may not submit the appraisal records to the appraisal review board for review and determination of protests until the chief appraiser has delivered the notices required by Section 25.19).

6. *See* Act of May 22, 1999, 76th Leg., R.S., ch. 631, § 12, 1999 TEX. GEN. LAWS 3191, 3197 (amended 2005, 2007, and 2011) (current version at TEX. TAX CODE ANN. § 41.44(a)(3)); TEX. TAX CODE ANN. § 25.23(d) (West 2015 & Supp. 2015).

7. TEX. TAX CODE ANN. § 25.23(d).

8. *Id.* § 25.23(e); *see also id.* § 25.24 (West 2015) ("The appraisal records, as changed by order of the appraisal review board and approved by that board, constitute the appraisal roll for the district.").

9. *Id.* § 25.25(a) (West 2015).

10. *Id.* § 26.09(a), (b) (West 2015 & Supp. 2015).

If the chief appraiser or the appraisal review board fails to provide or deliver a required notice, the property owner may protest the lack of notice. *See* TEX. TAX CODE ANN. § 41.411(a) (West 2015). If the appraisal review board determines that such a notice was not delivered, then it will consider the property owner's other grounds for protest. *Id.* § 41.411(b).

■ But there is a catch. A property owner is not entitled to have the lack-of-notice protest heard and determined unless, before the taxes become delinquent, the property owner files the notice of protest [11] and pays the lesser of the amount due or the amount assessed on the undisputed portion of the property's taxable value.[12] If the chief appraiser fails to deliver the property owner's notice of the appraised value before the taxes become delinquent, then the property owner loses the opportunity to protest the late notice, and with it, the right to protest any other ground that the Code authorizes. *See Indus. Commc'ns, Inc. v. Ward Cty. Appraisal Dist.*, 296 S.W.3d 707, 715–17 (Tex. App.–El Paso 2009, pet. denied). In such circumstances, the Code formerly provided no relief, and the courts were left to address the appropriate remedy for the violation of the property owner's right to due process. *See id.*

To close this gap, the legislature amended the Code by adding section 41.44(c–3), which applies to a tax protest filed on or after January 1, 2008.[13] Section 41.44(c–3) provides as follows:

> Notwithstanding Subsection (c),[14] a property owner who files a [lack-of-notice] protest under Section 41.411 on or after the date the taxes on the property to which the notice applies become delinquent, but not later than the 125th day after the property owner, in the protest filed, claims to have first received written notice of the taxes in question, is entitled to a hearing solely on the issue of whether one or more taxing units timely delivered a tax bill. If at the hearing the appraisal review board determines that all of the taxing units failed to timely deliver a tax bill, the board shall determine the date on which at least one taxing unit first delivered written notice of the taxes in question, and for the purposes of this section the delinquency date is postponed to the 125th day after that date.

TEX. TAX CODE ANN. § 41.44(c–3) (West 2015).

## B. The Parties' Arguments About These Procedures

In its motion for summary judgment, Heritage challenged the District's compli-

---

11. Act of May 28, 1989, 71st Leg., R.S., ch. 796; § 36, 1989 TEX. GEN. LAWS 3591, 3601–02 (amended 1991, 1999, 2005, 2007, and 2011) (current version at TEX. TAX CODE. ANN. § 41.44(c)).

12. Act of May 21, 1985, 69th Leg., R.S., ch. 504, § 1, 1985 TEX. GEN. LAWS 2089, 2089 (amended 2007 and 2011) (current version at TEX. TAX CODE ANN. § 41.411(c)); Act of May 14, 1997, 75th Leg., R.S., ch. 203, § 1, 1997 TEX. GEN. LAWS 1070, 1070 (amended 2007, 2009, and 2013) (current version at TEX. TAX CODE ANN. § 42.08(b)). The property owner also cannot challenge the appraised value by a motion filed after the taxes become delin-

quent. *See* TEX. TAX CODE ANN. § 25.25(d) (West 2015).

13. *See* Act of May 25, 2007, 80th Leg., R.S., ch. 1106, § 4(b), 2007 TEX. GEN. LAWS 3738, 3739 (adding section 41.44(c–3)); *id.* § 4(c), 2007 TEX. GEN. LAWS at 3739 (providing that the change in the law applies to protests filed on or after the effective date of the Act); *id.* § 7, 2007 TEX. GEN. LAWS at 3740 (stating that the effective date of the Act is January 1, 2008).

14. *See supra* note 11.

ance with the first step in the tax-appraisal process. As discussed further *infra*, Heritage argued that the tax assessments are void and presented evidence that the property was not added to the District's appraisal records within two years of the 2004 tax year. Because a property owner is entitled to protest the inclusion of its property on the appraisal records, *see id.* § 41.41, Heritage anticipated that the Taxing Units would contend that Heritage is barred from raising the issue in the trial court because it did not file a protest. Heritage therefore defensively argued that it had no opportunity to file a protest because it had no notice of the appraised value until it received a delinquent-tax statement in May 2007. Relying on the law as it existed at that time, Heritage maintained that it was denied due process because by the time it received the delinquent-tax notice, it was too late to file a protest and obtain a hearing. *See Tex. Pipe Line Co. v. Anderson*, 100 S.W.2d 754, 762 (Tex.Civ.App.–Austin 1937, writ ref'd) ("[T]he requirement of due process is satisfied if the party assessed is given an opportunity to be heard before some assessment board at some stage of the proceedings; it being sufficient if he is granted the right to be heard on the assessment before the valuation is finally determined."); *Indus. Commc'ns*, 296 S.W.3d at 714, 717 (explaining that "the pre–2008 version of Section 41.411 left open a small gap in which the Tax Code fail[ed] to provide adequate due process for a taxpayer who does not receive notice in time to take advantage of Section 41.411," and holding that a taxpayer that received no notice of the appraisal or assessment until after the taxes were delinquent did not fail

to exhaust administrative remedies because "the Tax Code did not provide [the taxpayer] with any remedies").

In their combined summary-judgment response and plea to the jurisdiction, the Taxing Units did indeed argue that Heritage failed to exhaust its administrative remedies by filing a protest and obtaining a hearing, and thus, the trial court lacked jurisdiction to rule on Heritage's defense. According to the Taxing Units, Heritage could have protested the alleged lack of notice under section 41.44(c–3), which would have pushed the delinquency date back and allowed Heritage to raise any other grounds of protest before the appraisal review board. The dispute about which version of the Code applies is a matter of statutory construction, which we review de novo. *See Nathan v. Whittington*, 408 S.W.3d 870, 872 (Tex.2013) (per curiam).[15]

**C. Postponement of the Delinquency Date Based on Lack of Notice**

As we have seen, section 41.44(c–3) applies to a protest of late notice filed on or after January 1, 2008, and entitles the property owner to a hearing if the late-notice protest is filed not later than the 125th day after the property owner claims to have first received written notice of the disputed taxes. It would have been impossible for a property owner to satisfy both of those conditions if it first received written notice of the taxes more than 125 days before January 1, 2008, that is, before August 29, 2007.

Heritage maintains that it first received written notice of the taxes on May 23, 2007—223 days before January 1, 2008—

---

**15.** Although we normally would begin by reviewing the summary-judgment motion that the trial court granted, the Taxing Units' jurisdictional arguments and evidence are not part of its summary-judgment motion. We there-

fore begin our review with Heritage's summary-judgment motion, because the motion and response contains both sides' jurisdictional arguments and evidence.

and introduced evidence supporting that position. The Taxing Units neither argued nor introduced evidence that Heritage first received such notice at a later date. Thus, section 41.44(c–3) does not apply, and Heritage accordingly had no opportunity to retroactively postpone the delinquency date based on lack of notice.

In support of their argument to the contrary, the Taxing Units rely on *Rio Valley, LLC v. City of El Paso*, 441 S.W.3d 482 (Tex.App.–El Paso 2014, no pet.). The property owner in *Rio Valley* maintained that it received no appraisal notices or tax bills, but there is a crucial distinction in the chronology of that case. *See id.* at 484–85. In *Rio Valley*, the property owner received its first notice of the taxes when it was served with a delinquent-tax suit on October 20, 2008; thus, "any protests by Rio Valley would necessarily have been filed after the effective date of Section 41.44(c–3)." *Id.* at 489. Unlike the case before us, it was possible for the property owner in *Rio Valley* to seek a retroactive postponement of the delinquency date through a protest filed *both* (1) after January 1, 2008; and (2) within 125 days after first receiving written notice of the taxes. Heritage lacked that opportunity, because complying with one requirement rendered it impossible to comply with the other.

The Taxing Units additionally contend that the taxes actually were not delinquent until 2009, and thus, Heritage had time to protest the lack of notice. As support for this argument, they cite section 31.04(a–1) of the Code, which provides as follows:

If a tax bill is mailed that includes taxes for one or more preceding tax years because the property was erroneously omitted from the tax roll in those tax years, the delinquency date provided by Section 31.02 [16] [i.e., February 1 of the year following the year in which imposed] is postponed to February 1 of the first year that will provide a period of at least 180 days after the date the tax bill is mailed in which to pay the taxes before they become delinquent.

TEX. TAX CODE ANN. § 31.04(a–1) (West 2015). Relying on this provision, the Taxing Units assert that "[i]f, as Heritage alleges, no prior notices or tax bills were mailed or received prior to December 2007, then the taxes would not have become delinquent until February 1, 2009 and it had until January 31, 2009 to pursue [a protest of failure to give notice]." This argument is based on assumptions that are contrary to the undisputed facts. Heritage does not allege that no notices or tax bills were mailed before December 2007; to the contrary, Heritage admits that it received written notice of the taxes in May 2007. Moreover, the summary-judgment evidence shows that Barbers Hill Independent School District stated in its May 2007 correspondence that Heritage's 2004 taxes already were delinquent. [17] Because the Taxing Units neither argued to the contrary in the trial court nor offered any controverting evidence, we do not consider this argument further.

In sum, Heritage's legal argument is correct: if Heritage first received written notice of the taxes in May 2007, then Heritage did not fail to exhaust its administrative remedies for the lack of notice because

---

16. Act of May 26, 1991, 72nd Leg., R.S., ch. 381, § 1, 1991 TEX. GEN. LAWS 1438, 1438 (amended 2003 and 2015) (current version at TEX. TAX CODE ANN. § 31.02).

17. Because the Taxing Units ask us to affirm the summary judgment granted to them on the sole ground that their delinquent-tax records were correct, we do not read this argument as an admission that the delinquent-tax notice was wrong.

no such remedy existed. Of course, if a notice of the property's appraised value was delivered to Heritage in December 2006 as the Taxing Units contend, then there was no lack of notice, and Heritage had thirty days in which to file any protest it wished. If that fact was conclusively established, then the trial court erred in failing to grant the Taxing Units' plea to the jurisdiction. We turn now to that factual dispute.

### D. Date of Heritage's First Written Notice of the Appraised Value

In its summary-judgment motion, Heritage asserted that on May 23, 2007, it received its first written notice of the supplemental assessment of 2004 taxes, and that it did not receive an earlier notice stating the property's appraised value. The Taxing Units filed a response in which they represented that the District or its agent delivered a notice of appraised value to Heritage on December 16, 2006.

#### 1. Heritage satisfied its summary-judgment burden to establish that its first written notice of appraised value was delivered in May 2007.

■ In support of its position, Heritage included in its summary-judgment evidence the affidavit of its attorney Robert J. Myers and documents that Myers received in response to his open-records requests to the District. According to Myers, Heritage received a "Combined Tax Statement" from Barbers Hill Independent School District in May 2007. The Combined Tax Statement was dated May 21, 2007, and identified the taxes at issue as "2004 Supplement for Underground Storage Inventory" in Mont Belvieu, Texas. In this document, the school district

identified the property's assessed value as $8,340,090; informed Heritage that it owed $149,279.27 for the 2004 taxes and a further $41,798.20 for penalties, interest, and attorney's fees; and stated, "The taxes for this year are delinquent."

Myers explained that he responded on May 25, 2007 by sending an open-records request to the District and the Appraisal Review Board, seeking " 'Supplemental Appraisal Records' touching, concerning or relating to" Heritage's property for the 2004 tax year. Myers attached a copy of the letter, which shows that his request included "any records reflecting when such supplemental appraisal records were prepared and/or approved as well as any records reflecting notice to [Heritage] of inclusion of their property(s) on any supplemental appraisal records for tax year 2004, including the date(s) of such notice(s)."

Michael Fregia, the District's Chief Appraiser at the time, responded to the open-records request by producing the following documents:

(a) A document captioned "Appraisal District for Chambers County Change Sheet," in which the chief appraiser ordered changes to the appraisal records on May 15, 2007. The Change Sheet identified Heritage as the owner of personal property having a total appraised value of $8,340,093.[18]

(b) A copy of the May 21, 2007 "Combined Tax Statement" received by Heritage.

(c) A document titled "Tax Adjustment," which was addressed to Heritage from Barbers Hill Independent School District and dated

---

18. As discussed further *infra*, the documents differ in their statements of the property's appraised value.

May 21, 2007. Like the "Combined Tax Statement," this document identifies the property's appraised value as $8,340,090 and states the taxes assessed on that amount, but it contains neither a request for payment nor any mention of delinquency, penalty, interest, or attorney's fees.

(d) A U.S. Post Office return receipt showing that the material posted by Barbers Hill Independent School District on May 21, 2007 was delivered to Heritage on May 23, 2007.

(e) An undated, unsigned document stamped "Office Copy" and bearing the legend, "**THIS IS NOT A TAX BILL—DO NOT PAY FROM THIS NOTICE.**" This document lists the property's taxable value as $8,340,090, and identifies the Taxing Units' tax rates and Heritage's estimated taxes. The document also states, "Last Date to File Protest: Jan. 16, 2007."

Regarding the last document, Myers attested that "Heritage never saw this document prior to receiving the District's response to its open records request."[19] He also stated that Heritage "avers that it never received any such notice" of ap-

praised value. After describing the documents received in response to the open-records request, Myers stated, "No documents exist which show that Heritage ever received any notice of value for the 2004 tax year prior to receiving a tax bill in May, 2007."[20]

This evidence is sufficient to establish that Heritage first received written notice of the taxes in May 2007 and that its right to due process was violated because it was not informed of the appraisal or taxes until it was too late to file a protest. The burden therefore shifted to the Taxing Units to defeat Heritage's right to summary judgment on this issue by raising a genuine question of material fact about whether Heritage received written notice of the appraised value or of the assessed taxes in time to file a protest.

*2. The Taxing Units failed to raise a question of fact about whether a notice of appraised value was delivered to Heritage before May 2007.*

■ In their response to Heritage's motion for summary judgment, the Taxing Units represented that Capitol Appraisal Group, Inc. ("CAGI"), a private appraisal company located in Austin, Texas, appraised Heritage's property pursuant to a contract with the District.[21] According to

---

**19.** The Taxing Units objected to Myers's affidavit solely on the ground that an attorney may not act both as an advocate and a fact witness in an adjudicatory proceeding. *But see* Tex.R. Civ. P. 14 ("Whenever it may be necessary or proper for any party to a civil suit or proceeding to make an affidavit, it may be made by either the party or his agent or his attorney."). The trial court overruled the objection, and on appeal, the Taxing Units do not contest that ruling or even mention Myers's affidavit.

**20.** Both in Heritage's pleadings and summary-judgment motion and responses, Myers used the term "tax bill" or "tax bills" to refer both to original tax bills and to delinquent-tax

statements. For example, in Heritage's pleadings, Myers described the material Heritage received in May 2007 as documents "purported to be tax bills," but asserted that the Taxing Units "have yet to send Heritage a proper, complete tax bill" for 2004. The Combined Tax Statement is the only document in the record in which a Taxing Unit asked Heritage to pay 2004 personal-property taxes, but as previously discussed, that document notified Heritage of a delinquency.

**21.** *See* Tex. Tax Code Ann. § 25.01(b) (West 2015) (permitting the chief appraiser, with the approval of the appraisal district's board of directors, to contract with a private ap-

the Taxing Units, CAGI delivered a notice of appraised value to Heritage on or about December 15, 2006. The Taxing Units argue that Heritage failed to exhaust administrative remedies because it failed to file a protest within the thirty-day window beginning with the delivery of the notice. *See* TEX. TAX CODE ANN. § 25.23(d) (West 2015 & Supp.2015).

As evidence that a notice of appraised value was delivered as alleged, the Taxing Units rely on two affidavits. One affidavit was executed by Michael Fregia in 2011, while he was the District's chief appraiser and custodian of the District's records; the other was executed by Fregia's deputy Colleen Waits. Both attested that "[o]n or about December 15, 2006, CAGI delivered a Notice of Appraised Value to Heritage as required by section 25.19 of the Texas Tax Code." As support for that testimony, both Fregia and Waits cited and attached the same undated notice of appraised value, which is similar, but not identical, to document (e) above.[22]

Heritage objected to the quoted testimony by Fregia on the grounds that it was hearsay and was 'not based on personal knowledge as the affiant cannot testify as to what a third party, CAGI, did or did not do regarding delivery of notice." Heritage also objected that the testimony was "an unsubstantiated factual conclusion in that

it offers no support for how or when the third party 'delivered' any kind of notice," and "an unsubstantiated legal conclusion in that it states without support that 'delivery' was made pursuant to the Tax Code by a third party."[23] Regarding Waits's testimony, Heritage raised the same objections that the statement was hearsay and no more than an unsubstantiated factual and legal conclusion, adding that the statement presumed facts not in evidence and constituted "pure speculation that notice of any kind was ever delivered pursuant to the Texas Tax Code."

The trial court overruled these and other objections, and on appeal, Heritage reurges its objections that the testimony is hearsay concerning what a third party did, and that the affiants offered no facts or information as to how they could have personal knowledge of what CAGI did to deliver any notice. The Taxing Units respond that the trial court correctly overruled Heritage's objections, but they do not further address the matter.

After reviewing the trial court's ruling on Heritage's objections under the applicable abuse-of-discretion standard,[24] we conclude that Heritage is correct. Fregia and Waits's testimony that CAGI delivered a notice of appraised value to Heritage on December 15, 2006 is an unsubstantiated

---

praisal firm to perform appraisal services for the district).

**22.** As compared to the document provided in response to the open-records request, the documents attached to Fregia and Waits's affidavits use different fonts and formatting and are not stamped. In addition to these cosmetic differences, the document provided in response to the open-records request states, "If you want the Appraisal Review Board (ARB) to hear and decide your case, you must file this form with the ARB by *the date indicated in the shaded box above (A).* " (emphasis added). The documents attached to Fregia and Waits's affidavits omit the italicized language.

**23.** Heritage raised the same objections to statements in Fregia's affidavit that "a notice of appraised value was delivered to Heritage in December 2006" and "the notice was delivered on or about December 16, 2004[sic]."

**24.** *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 906 (Tex.2000) (explaining that evidentiary rulings are reviewed for abuse of discretion and will be reversed only if they probably caused the rendition of an improper judgment).

factual conclusion. Neither affiant has identified any basis for this statement, and neither has attempted to explain how an official in Chambers County personally knows that (a) a company in Travis County delivered a document to Heritage; (b) the document the company delivered was the notice of appraised value they cite; and (c) the company delivered the undated notice on or about December 15, 2006. Because this affidavit testimony is not competent summary-judgment evidence, the trial court abused its discretion in overruling Heritage's objection to it. *See* Tex.R. Civ. P. 166a(f).

We are left, then, with no competent summary-judgment evidence that a notice of appraised value was delivered. Although a property owner has thirty days after such a notice is delivered in which to file a protest, *see* Tex. Tax Code Ann. § 25.23(d), the failure to deliver the notice deprived Heritage of this opportunity to protest the appraisal, and as previously discussed, Heritage also had no opportunity to protest the failure to give notice. We accordingly conclude that Heritage has established that its right to due process was violated.

■ Courts differ on the appropriate remedy for such a violation. Some have held that where the Code affords no relief, the appropriate course of action is to hold the taxes void. *See, e.g., Indus. Commc'ns*, 296 S.W.3d at 722–23. We conclude, however, that such relief is contrary to the legislature's express statement that failure to receive such a notice affects neither the appraisal's validity nor the taxes based on it. *See* Act of May 30, 1999, 76th Leg., R.S., ch. 1517, § 1, 1999 Tex. Gen. Laws 5239, 5240 (amended 2003, 2005, 2007, and 2015) (current version at Tex. Tax Code Ann. § 25.19(d)). Moreover, violations of the taxpayer's constitutional rights already fall within an exception to the exhaustion-of-administrative-remedies requirement. *See Strayhorn v. Lexington Ins. Co.*, 128 S.W.3d 772, 780 (Tex.App.–Austin 2004), *aff'd*, 209 S.W.3d 83 (Tex. 2006); *Harris Cty. Appraisal Dist. v. Dincans*, 882 S.W.2d 75, 78–79 (Tex.App.–Houston [14th Dist.] 1994, writ denied). Under this exception, a property owner whose constitutional rights were violated may raise before the trial court the same grounds of protest that it was denied the opportunity to raise before the appraisal review board.

We conclude that Heritage is not barred from presenting its claim and defense by the failure to exhaust administrative remedies. We accordingly hold that the trial court had jurisdiction to consider Heritage's summary-judgment argument that the 2004 tax assessment is void because the property was not added to the appraisal records within two years. *See* Tex. Tax Code Ann. § 25.21(a) (West 2015).

## V. HERITAGE'S DEFENSE THAT THE PROPERTY WAS NOT ADDED TO THE APPRAISAL RECORDS WITHIN TWO YEARS

■ To support its summary-judgment argument that the chief appraiser failed to add Heritage's property to the supplemental appraisal records for 2004 within two years, Heritage relied on the Change Sheet, among other evidence. The right half of the Change Sheet is a request for "appropriate changes ... as per CAGI." In that section of the Change Sheet, Heritage is identified as the "New Owner" of the property; Heritage's address is listed as the "New Address"; and the property's "New Market Value" is stated to total $8,340,093. The request was signed by Waits on May 7, 2007. The left half of the document contains the statement, in bold capital letters, "This change sheet is issued for the purpose of correcting *records*. With the exception of unclaimed home-

steads, nothing herein suggest [sic] that taxes must be altered." (emphasis added). Below this is stated, "It is therefore OR-DERED that the Chief Appraiser of the Chambers County Appraisal District correct state [sic] error *in the appraisal records.*" (emphasis added). Fregia signed and dated the order on May 15, 2007.

Of the material produced in response to the open-records request for any records reflecting when supplemental appraisal records for the 2004 tax year relating to Heritage's property were prepared and/or approved, the Change Sheet is the only document that refers to "appraisal records," and it. is dated more than four months after the statutory deadline for adding omitted personal property to the supplemental appraisal records for 2004. This evidence is sufficient to show that the property was not added to the appraisal records within two years of the 2004 tax year and to shift the burden to the Taxing Units to respond with competent summary-judgment evidence that the property was added to the appraisal records before the end of 2006. To do so, the Taxing Units relied on two statements from Fregia's affidavit and the previously discussed notice of appraised value.

First, Fregia attempted to show that the Change Sheet was not evidence of when the property first was added to the appraisal records. Fregia stated that the Change Sheet "does not indicate when the property was added to the 2004 appraisal records. It merely indicates that the District notified the taxing units of the change to the appraisal roll so that they could add this property to their tax rolls." But, what the document does or does not indi-

cate is shown by the document itself. It is not directed to any taxing unit, and it does not record any other communications to a taxing unit. It also does not order or communicate a change to the appraisal roll or to a taxing unit's tax roll. It refers only to the appraisal records. As the Taxing Units emphasized in their summary-judgment response, "[t]hey are not the same documents and the terms are not interchangeable." The difference between the two documents is stated in the Code: "The appraisal records, as changed by order of the appraisal review board and approved by that board, constitute the appraisal roll for the district." *See* TEX. TAX CODE ANN. § 25.24 (West 2015). The Change Sheet does not order the appraisal roll changed; it orders the appraisal records changed. It neither contains nor mentions an order of the appraisal review board or the board's approval; it contains an order only by Fregia as the chief appraiser. Finally, the change was not made "as per the appraisal review board"; the change was requested only "as per CAGI," the company responsible for appraising the property. Fregia's testimony about what the document indicates does not raise a question of fact, because that testimony is conclusively negated by the unambiguous language of the document itself. *See City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005).

Second, Fregia attested that the property was added to the appraisal records in December 2006. He explained that a notice of appraised value is generated from the data in the appraisal records, and "[i]f a property is not listed in the appraisal records it is physically impossible to generate this notice." [25] Fregia cited the no-

---

25. Fregia does not explain why, if the notice of appraised value is generated from the appraisal records' data, the property's value as stated in the notice differs from its value as stated in City of Mont Belvieu's delinquent-tax

records, in Chambers County's delinquent-tax records, in CAGI's records, in the Change Sheet, and in Fregia and Waits's affidavit testimony that "the District added [the property] to the 2004 appraisal records at a value

tice of appraised value, which states that the property's appraised value is $8,340,090. It also states that any protest must be in writing and must be returned by January 15, 2007. As previously discussed, the Code permits a taxpayer to file a protest within thirty days after a notice of appraised value is delivered.[26] Given Fregia's testimony that a notice is generated from the appraisal records, the notice's reference to a January 15, 2007 protest deadline supports an inference that the property's 2004 appraisal data was entered in the appraisal records thirty days earlier, in December 2006. Because this evidence is sufficient to raise a genuine issue of material fact about whether the property was entered into the 2004 supplemental appraisal records within two years, the trial court did not err in denying Heritage's motion for summary judgment.

## VI. THE TAXING UNITS' SUMMARY-JUDGMENT MOTION

As previously mentioned, the Taxing Units sought summary judgment solely on the ground that certified copies of their delinquent-tax records constitute prima facie evidence that "each person charged with a duty relating to the imposition of the tax has complied with all requirements of law" and that the stated amount of delinquent taxes, penalties, and interest are correct. *See* TEX. TAX CODE ANN. § 33.47(a) (West 2015). The Taxing Units

attached such certified copies to their summary-judgment motion, thereby shifting the burden to Heritage to rebut the presumption that every person with a legal duty concerning the taxation of Heritage's property complied with that duty.

Heritage satisfied that burden. Its response to the Taxing Units' summary-judgment motion included the same evidence we have just discussed in connection with Heritage's summary-judgment motion. As explained above, Heritage established that it never received a notice of appraised value for tax year 2004, and that it first received written notice of the taxes when it received a delinquent-tax notice in May 2007. *See id.* § 1.07(c) (West 2015 & Supp.2015) (a notice permitted to be delivered by first-class mail is presumed delivered when deposited in the mail, but the presumption is rebutted by evidence of non-receipt); Act of May 26, 1999, 76th Leg., R.S., ch. 441, § 1, 1999 TEX. GEN. LAWS 2820, 2820 (amended 2005, 2011, 2013, and 2015) (unless the Code requires another method or the parties otherwise agree, all required notices may be delivered via first-class mail) (amended 2011) (current version at TEX. TAX CODE ANN. § 1.07(a));[27] *Dincans*, 882 S.W.2d at 78 (explaining that the presumption of delivery "will disappear if the taxpayer presents evidence that he in fact never received the notice").[28]

of $8,340,093.00." Nevertheless, we accept as true Fregia's testimony that a notice of appraised value cannot be generated until after the property has been added to the appraisal records.

26. *See supra* note 6.

27. The Taxing Units represent that a notice of appraised value was "delivered," but they neither argued nor offered evidence that such a notice was "mailed" or that Heritage agreed to any other method of delivery.

28. As noted in the preceding section, the documents relied upon by the Taxing Units in the competing summary-judgment motions and responses conflict with one another. Fregia and Waits attested that the property was added to the appraisal records in December 2006 at a value of $8,340,093, which is the figure stated in the Change Sheet. But to establish the date when the property was added, the affiants relied on the December 2006 notice of appraised value in which the property's value is stated to be $8,340,090. Barbers Hill Independent School District assessed taxes based on the lower value shown in the earlier notice

Because the evidence rebuts the presumption of compliance with all statutory duties, and this was the only ground on which the Taxing Units sought summary judgment, the trial court erred in granting the Taxing Units' motion. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993) ("[A] summary judgment cannot be affirmed on grounds not expressly set out in the motion or response.").

### VII. CONCLUSION

We conclude that Heritage rebutted the presumption that, regarding the appraisal and taxation of Heritage's personal property, all of those who were charged with statutory duties fulfilled them. We further conclude that the trial court abused its discretion in overruling Heritage's objections to the affidavit testimony of the Chambers County Appraisal District's former chief appraiser and deputy chief administrator concerning a third party's alleged delivery of a notice of appraised value in December 2006. The remaining summary-judgment evidence establishes that Heritage did not receive a notice of appraised value, and that it first received written notice of the tax assessment when Barber Hill Independent School District notified Heritage in May 2007 that its 2004 taxes were delinquent.

Under the Property Tax Code as it existed at the time, Heritage had no opportunity to pursue a lack-of-notice protest. Because Heritage cannot have failed to exhaust administrative remedies when no such remedies existed, we hold that the trial court was not deprived of jurisdiction over Heritage's tax-collection defense by Heritage's failure to do what could not be done. Reaching the merits of that defense, we conclude that the Taxing Units

of appraised value, but Chambers County and the City of Mont Belvieu assessed taxes based on the later, higher appraised value stated in

produced evidence sufficient to raise a fact question about whether Heritage's personal property was added to the 2004 supplemental appraisal records within two years.

We therefore reverse the judgment in the Taxing Units' favor and remand the cause to the trial court.

the May 2007 Change Sheet. The discrepancy that led to an increase in Heritage's tax liability is unexplained.